

FILED

SEP 26 2014

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1 LAURA E. DUFFY
United States Attorney
2 PHILLIP L.B. HALPERN
Assistant United States Attorney
California State Bar No. 133370
3 EMILY W. ALLEN
Special Assistant U.S. Attorney
4 California State Bar No. 234961
880 Front Street, Room 6293
5 San Diego, California 92101-8893
Telephone:(619) 546-9738
6 Fax:      (619) 546-0450
Email:   emily.allen@usdoj.gov
7
Attorneys for Plaintiff
8 United States of America

9

10                 IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11

12 UNITED STATES OF AMERICA,        )   Case No.:  14cr2703 BEN
                                    )
13            Plaintiff,            )
      vs.                           )
14                                  )   INFORMATION
   ISRAEL HECHTER,                  )
15                                  )
              Defendant.            )
16 _____ )

17     The United States Attorney charges, at all times material:

18             SECONDARY MORTGAGE MARKET FRAMEWORK

19     1.   In   the   United   States,   residential   mortgage   lenders

20 typically sell the loans they originate to third-party investors, to

21 the Federal National Mortgage Association (known as "Fannie Mae"), or

22 to the Federal Home Loan Mortgage Corporation (known as "Freddie

23 Mac").  By selling these loans, lenders reduce their credit risk and

24 gain access to additional capital, which in turn provides borrowers

25 with greater access to mortgage loans.  This secondary mortgage

26 market exceeds $10 trillion, and is essential to the healthy

27 functioning of the American housing market and the American economy.

28

2.   Secondary mortgage purchasers often combine the loans they purchase into what is known as collateralized mortgage obligations ("CMOs") or residential mortgage-backed securities ("RMBSs").   CMOs and RMBSs are then typically re-sold to institutional investors such as pension funds and insurance companies.   These products are then also often combined into ever-more complex collateralized debt obligations ("CDOs"), which may include other types of debt obligations such as corporate loans.

3.   This form of mortgage securitization provides increased capital because the risk of default is, in theory, greatly reduced by the aggregation of large numbers of mortgage loans, allowing even high-risk individual loans to be categorized as "safe" investments when they are pooled together.

4.   As a result of the secondary market for mortgages, the connection between borrowers and lenders has weakened, as loan originators no longer have a direct stake in ensuring that individual borrowers can repay their loans.   As a result, secondary purchasers, who bear the risk of default, heavily influence lending standards. As mortgage loans are re-packaged and securitized, collateralized, and re-sold into products seen as "safe" investments, those lending standards deteriorate.   The resulting complexity of mortgage securities products, lack of regulation and ratings standards, and abundance of credit availability are often cited as the causes of the financial collapse of 2008.

## BACKGROUND ALLEGATIONS

5.   Beginning in approximately 2004, Defendant ISRAEL HECHTER worked at the San Diego-based business Blue View Corporation ("Blue View"), which was owned by S.R. and S.R.'s wife S.B.

2

6. In or around late 2005 or early 2006, ISRAEL HECHTER left Blue View and started his own San Diego-based companies, including Ocean 18, LLC, Note Tracker Corp., Nationwide Servicing Center, and Instant Mortgage Lending. ISRAEL HECHTER operated these businesses along with his brother, A.H., and business associates J.P. and J.C.

7. Through each of these businesses, ISRAEL HECHTER participated in the secondary mortgage market, purchasing primarily distressed and non-performing second mortgages from primary lenders, and servicing the loans by collecting payments from borrowers.

8. In addition to purchasing and servicing loans, ISRAEL HECHTER pooled these loans and sold shares of the pools to investors, primarily friends and family, including A.H., their father Z.H., J.P., and J.C. The investors would collect returns when borrowers made monthly payments, paid off their mortgage loans, or after foreclosure on the real property collateral.

9. Through these companies, ISRAEL HECHTER purchased mortgage notes from, among other lenders, J.P. Morgan Chase ("Chase") (also known as Bank One), National City Bank ("National City"), and GMAC Mortgage, LLC ("GMAC") (now known as Ally Bank). Chase, National City, and GMAC were all financial institutions insured by the Federal Deposit Insurance Corporation.

10. From approximately 2004 to approximately 2010, L.S. worked on and off at Chase in the Residential Loan Department. As part of her job, L.S. sold mortgage loans, including distressed or non-performing second mortgages, to third-party investors, including ISRAEL HECHTER. Chase sold the notes to the highest qualified bidder after distributing lists of the loans offered for sale.

3

1    11.   In and around 2008 and 2009, E.J. worked at National City.
2  As part of her job, E.J. sold mortgage loans, including distressed or
3  non-performing second mortgages, to third-party investors, including
4  ISRAEL HECHTER.

5    12.   From approximately 2011 to approximately 2012, Robert
6  Moreno ("Moreno") (charged elsewhere) worked at GMAC as a Market
7  Manager.  As part of his job, Moreno sold mortgage loans, including
8  distressed or non-performing second mortgages, to third-party
9  investors, including ISRAEL HECHTER.   GMAC sold the notes to the
10  highest qualified bidder after distributing lists of the loans
11  offered for sale.

12
13                          COUNT ONE
14                        18 U.S.C. § 371
15                        (CONSPIRACY)
16    13.   Paragraphs 1 through 12 are realleged and incorporated by
17  reference herein.
18    14.   Beginning in or around 2004, and continuing through at
19  least in or around June 2013, in the Southern District of California
20  and elsewhere, defendant ISRAEL HECHTER knowingly and intentionally
21  conspired and agreed with L.S., E.J., Moreno, S.R., S.B., A.H., Z.H.,
22  J.P., J.C., and others to commit Bank Bribery, in violation of Title
23  18, United States Code, Section 215, and Tax Evasion, in violation of
24  Title 26, United States Code, Section 7201.
25                    Purpose of the Conspiracy
26    15.   It was the purpose of the conspiracy that ISRAEL HECHTER,
27  S.R., S.B., A.H., Z.H., J.P., and others would corruptly pay hundreds
28  of thousands of dollars in bribes to L.S., E.J., and Moreno

                              4

1   (hereinafter together, "the bankers"), which were sometimes paid in

2   cash and otherwise concealed from the Internal Revenue Service

3   ("IRS") to assist the bankers in evading federal income taxes on the

4   illicit income, and, in return, the bankers would use their influence

5   at the banks where they worked to arrange for ISRAEL HECHTER's bids

6   to purchase mortgage loans to be accepted.

7                 Manner and Means of the Conspiracy

8      16. To further the conspiracy, ISRAEL HECHTER, S.R., S.B.,

9   A.H., Z.H., J.P., J.C., the bankers, and others utilized the

10   following manner and means, among others:

11      a. The bankers would use their positions at the banks

12     where they worked to arrange for ISRAEL HECHTER's bids to be

13     accepted. Among other things, the bankers would alter bids,

14     reject bids, and erase or ignore bids from qualified

15     competitors, and would provide ISRAEL HECHTER confidential

16     information about prices and competing bids.

17      b. In return, the bankers would corruptly accept

18     $1 million in bribe payments from ISRAEL HECHTER and his

19     associates, including S.R., S.B., A.H., J.P., and Z.H.

20      c. ISRAEL HECHTER, S.R., S.B., A.H., J.P., Z.H., and

21     others would arrange to pay the bankers by personal check, in

22     hand-delivered cash payments, and through other methods so that

23     the bankers could evade payment of income tax to the IRS.

24      d. ISRAEL HECHTER would enter into a sham "consulting"

25     agreement with Moreno, in order to disguise the true nature of

26     the bribe payments and to make them appear like legitimate fees

27     paid for consulting services unrelated to Moreno's work at GMAC.

28

e.   J.P. and others would recruit additional investors in part by touting the businesses' inside connections at the banks and by describing that they would receive information from the bankers that was not available to competitors.

### Overt Acts

17.   In furtherance of this conspiracy, and to carry out its objects, the following overt acts, among others, were committed within the Southern District of California and elsewhere:

a.   In or around 2004, S.R., S.B. and another Blue View employee told ISRAEL HECHTER that they paid bribes to bank employees and, in return, the bank employees would help award loans to Blue View.

b.   In or around 2004, S.R. asked ISRAEL HECHTER to contact L.S. and offer to pay L.S. in return for her help awarding loans to Blue View.

c.   In or around 2004, ISRAEL HECHTER contacted L.S. and offered to pay approximately $100 to $300 per loan in return for preferential treatment in the sale of Chase loans.  L.S. agreed.

d.   In or around 2004, ISRAEL HECHTER, S.R., and S.B. mailed payments to L.S.'s home, as compensation for Chase loans awarded to Blue View.

e.   In or around 2004, ISRAEL HECHTER, S.R., and S.B. sent L.S. approximately $70,000, which L.S. used to purchase property near Lake Havasu, Arizona, as payment for L.S.'s assistance arranging for Blue View's bids to be accepted.

f.   In or around 2004 and 2008, A.H. invested money in pools of mortgages purchased from Chase, and knowingly paid ISRAEL HECHTER for a portion of the bribes paid to L.S.

g.    In or around 2008 or 2009, J.P. invested money in pools of mortgages purchased from Chase, and knowingly paid ISRAEL HECHTER for a portion of the bribes paid to L.S.

h.    In or around early 2008, at L.S.'s request, ISRAEL HECHTER stopped issuing IRS Form 1099s to L.S. reflecting the illegal payments, so that L.S. could evade paying income taxes on the illegal payments.

i.    In or around 2008, ISRAEL HECHTER agreed with E.J. to pay bribes in exchange for E.J.'s assistance arranging for ISRAEL HECHTER's bids to purchase loans from National City to be accepted.

j.    In or around 2008, A.H. invested money in pools of mortgages purchased from National City, and knowingly paid ISRAEL HECHTER for a portion of the bribes paid to E.J.

k.    On or about November 1, 2010, ISRAEL HECHTER arranged for Note Tracker Corp. to write a check for $3,450 to L.S., in return for her influence helping ISRAEL HECHTER to win bids to purchase 23 loans from Chase.  Per ISRAEL HECHTER's instructions and at L.S.'s request, no IRS Form 1099 was issued in connection with this payment.

l.    In or around late 2011, using Moreno's personal cell phone, ISRAEL HECHTER and Moreno had a telephone call in which they agreed that ISRAEL HECHTER would make personal payments to Moreno in return for Moreno's help arranging for ISRAEL HECHTER's bids to purchase mortgage notes from GMAC to be accepted.

m. On or about December 2, 2011, ISRAEL HECHTER arranged for Ocean 18, LLC to write a check to Moreno for $16,149, which ISRAEL HECHTER had delivered to Moreno's home in New Jersey.

n. On or about December 5, 2011, J.C. invested money in a pool of mortgages purchased from GMAC, and knowingly paid ISRAEL HECHTER a portion of $6,000 in bribes paid to Moreno.

o. In or around late 2011, A.H., J.P., and J.P.'s investors invested money in pools of mortgages purchased from GMAC, and A.H. and J.P. knowingly paid ISRAEL HECHTER for a portion of the bribes paid to Moreno.

p. On or about February 23, 2012, J.P. told his investors that "this month we have a unique opportunity to buy loans before the other investors see the list."

q. In or around March 2012, ISRAEL HECHTER asked A.H. to write personal checks to Moreno, as bribe payments for loans purchased from GMAC. A.H. agreed.

r. On or about March 7, 2012, A.H. wrote a personal check for $50,000 to Moreno, drawn on A.H.'s personal bank account.

s. In or around May 2012, ISRAEL HECHTER asked J.P. to write personal checks to Moreno, as bribe payments for loans purchased from GMAC. J.P. agreed.

t. On or about May 20, 2012, J.P. wrote a personal check for $7,000 to Moreno, drawn on J.P.'s personal bank account.

u. On or about June 19, 2012, J.P. told investors that they had an "opportunity to review other loan offers" before finalizing a sale.

v. On or about June 20, 2012, J.P. told investors that "we will have prices on all these loans from other investors by

Friday/Monday. We will decide loan by loan either to purchase depending on [] the going rate."

w. In or around mid-2012, Moreno told ISRAEL HECHTER he preferred to receive the unlawful payments in cash, as it made the nature and source of the payments more difficult to detect.

x. In or around mid-2012, to satisfy Moreno's request, ISRAEL HECHTER asked Z.H. to make hand-to-hand cash deliveries to Moreno.

y. In or around mid-2012, Moreno met Z.H. at a New York City car wash, which Z.H. owned, where Z.H. handed Moreno tens of thousands of dollars in cash.

z. In or around mid-2012, A.H. authorized an employee at Z.H.'s car wash to provide an envelope of cash to Moreno.

aa. In or around late 2012, ISRAEL HECHTER and Moreno agreed to enter into a sham "Consulting Agreement" to disguise the true nature and source of bribe payments that ISRAEL HECHTER owed to Moreno.

bb. In or around late 2012 or early 2013, Moreno set up a business, Phoenix Asset & Acquisition, Inc. ("Phoenix Asset"), and a corresponding bank account, which he used to enter into the sham "Consulting Agreement" with ISRAEL HECHTER and to receive bribe payments.

cc. In or around January 2013, ISRAEL HECHTER sent Moreno a written "Consulting Agreement" between Ocean 18, LLC, and Phoenix Asset, which Moreno signed.

dd.   On   or   about   June   28,   2013,   at   ISRAEL   HECHTER's instruction, J.P. wired approximately $336,111 in bribe payments to the Phoenix Asset bank account that Moreno controlled.

All in violation of Title 18, United States Code, Section 371.

DATED:   9/19/2014

LAURA E. DUFFY
United States Attorney

PHILLIP L.B. HALPERN
Assistant United States Attorney

EMILY W. ALLEN
Special Assistant U.S. Attorney